**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DONNA MAHL ROMBACH, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-556** |
| **JOE CULPEPPER, ET AL.** | **SECTION "B"(2)** |

## ORDER AND REASONS

Defendants Chief of Police Joe Culpepper, Warden Scott Adams, and Mayor Wendy O'Quin Perrette have filed a motion for summary judgment. Rec. Doc. 29. Plaintiff timely filed an opposition. Rec. Doc. 45. Defendants then sought, and were granted, leave to file a reply. Rec. Doc. 50. For the reasons discussed below,

**IT IS ORDERED** that the motion (Rec. Doc. 29) is **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises out of Gregory Rombach's death while in custody at the Bogalusa City Jail on July 9, 2015. *See* Rec. Doc. 3 ¶ 4. At 1:52 a.m. on Monday, July 6, 2015, Mr. Rombach was arrested for shoplifting from a Walmart.[1] *See* Rec. Doc. 29-6. During booking, the police learned that there was a warrant for Mr. Rombach's arrest for failure to appear. *See id.*; Rec. Doc. 29-7. Mr. Rombach was subsequently arrested per the warrant. *See* Rec. Docs. 29-6; 29-8. At 2:55 a.m. on July 6, 2015, Mr. Rombach filled out a medical form, indicating that he had no medical conditions

---

[1] It appears that Mr. Rombach stole a fishing hook that cost $2.00. *See* Rec. Doc. 29-15 at 4:6-14.

1

other than an allergy to penicillin. *See* Rec. Doc. 29-9 at 1-2. In the afternoon of July 6, 2015, Mr. Rombach was sentenced for failure to appear to fifteen days in custody or a $250.00 fine. *See* Rec. Doc. 29-10. Mr. Rombach's arraignment for the shoplifting arrest was set for one week later, on July 13, 2015. *See id.* Mr. Rombach was then returned to the custody of the Bogalusa City Jail. *See id.*

Mr. Rombach made three telephone calls from jail before he passed away. He first called his mother in the early hours of July 6, 2015, to tell her that he had been arrested and to ask that she bail him out of jail. *See* Rec. Doc. 29-13 at 3-5. He called his parents again, likely on July 7, 2015, when he spoke with his father. *See* Rec. Doc. 29-14 at 2. When asked how he was doing, Mr. Rombach responded, "Not so good, Dad." *Id.* Mr. Rombach also called his brother, but the record does not indicate when that call took place. *See* Rec. Doc. 29-15.

At some point after booking, Mr. Rombach told jail personnel that he was withdrawing from heroin. *See* Rec. Docs. 29-2 ¶¶ 10-11; 29-5 ¶¶ 6, 8. Scott Adams, the warden of the jail, states in his affidavit that a nearby hospital told him that "there is no real treatment of withdrawal symptoms and it is sufficient for the jail to observe the inmate in withdrawal and provide plenty of hydration, aspirin, and malox-type products to assist the inmate with the symptoms experienced in going through withdrawal." Rec.

Doc. 29-5 ¶ 13. According to Warden Adams, "Rombach requested and was given a small dose of castor oil for relief of constipation." *Id.* ¶ 14. There is no other evidence in the record of whether and how Mr. Rombach was treated for his withdrawal symptoms.

Warden Adams' employees had similar understandings of what jail policy required them do when an inmate was suffering from withdrawal symptoms. Louis Clark, a jail employee, testified in his deposition that inmates experiencing withdrawal symptoms are given "Imodium for diarrhea[,]" "ibuprofen for pain, [and] muscle spasm, and Emetrol [for] . . . nausea." Rec. Doc. 45-7 at 2. Lisa Erwin, another jail employee, echoed Clark's testimony in her own deposition when she testified that "[t]he only thing [the jail] give[s] [inmates] now is Emetrol, Imodium, and ibuprofen." Rec. Doc. 45-5 at 3. Erwin went on to explain that she didn't have "any protocols" for inmates going through withdrawal, but agreed with Warden Adams that the nearby hospital had recommended treatment with over-the-counter medications. *See id.* Erwin did not know if the hospital had told the jail how to know when an inmate's withdrawal symptoms are severe enough to warrant professional medical attention. *See id.*

At some point after informing jail personnel that he was in withdrawal, Mr. Rombach was moved to a private padded cell. *See* Rec. Doc. 29-2 ¶ 14. Jail personnel said that the move was "because [Mr. Rombach] was being disruptive" and so jail personnel wanted

3

to "observe [Mr. Rombach] better." *Id.* Jail personnel state that when questioned about his symptoms while in the private padded cell, Mr. Rombach "said he was fine and requested to go back to his cell [;]" a request that was accommodated. *See* Rec. Doc. 29-5 ¶ 11. Christopher Flot, an inmate who was in the jail at the same time as Mr. Rombach, states that Mr. Rombach "was placed in a private cell after he repeatedly called for medical attention." Rec. Doc. 45-3 at 1. Mr. Flot states that Mr. Rombach was moved to the private cell on Mr. Rombach's second day of incarceration, which was likely July 7, 2015.[2] *See id.*

Mr. Flot's declaration provides other details about Mr. Rombach's time in jail.[3] According to Mr. Flot, Mr. Rombach was assigned to the cell next to his, where the inmates were confined from 10:00 p.m. to 5:00 a.m. every day. *See* Rec. Doc. 45-3 at 1. Both Mr. Flot and Mr. Rombach had access to the same day room when not confined to their cells. *See id.* Mr. Flot states that Mr. Rombach ate "very little food, which he vomited up." *Id.* Mr. Flot heard Mr. Rombach "ask to be taken to a hospital for medical attention." *Id.* at 2. According to Mr. Flot, a prison employee who heard Mr. Rombach's request said that Mr. Rombach could not go to the hospital. *See id.* Mr. Flot also states in his declaration that

---

[2] The parties refer to logs that document Mr. Rombach's time in the jail, but neither party filed the logs into the record. *See* Rec. Doc. 45-6 at 2.
[3] The statements in Mr. Flot's declaration are consistent with a recorded conversation that Mr. Flot had with Mr. Rombach's mother the day that Mr. Rombach passed away. *See* Rec. Doc. 45-4.

4

he "personally told Mr. Otis, Mr. Lewis, [and] Ms. Knight that [Mr. Rombach] did not feel well, was not eating and was vomiting, and [that Mr. Rombach] needed a doctor."[4] *Id.* Mr. Flot also declares that the jail employees "did not make regular inspections of the cells when [the inmates] were on lockdown at night." *Id.* at 2-3.

Another inmate was also aware that Mr. Rombach was not feeling well.[5] Chadwick Hart, who either shared a cell with Mr. Rombach or Mr. Flot the night that Mr. Rombach passed away, told Detective David Miller that Mr. Rombach was throwing up at 11:00 p.m. on July 8, 2015, and that Mr. Rombach continued to throw up throughout the night. *See* Rec. Doc. 45-2. These statements are consistent with the prison report of Mr. Rombach's death. *See id.* When Detective Miller arrived at Mr. Rombach's cell on July 9, 2015 to investigate Mr. Rombach's death earlier that day, he saw vomit in the toilet in the cell. *See id.* An autopsy was subsequently conducted; the cause of death was a "perforated duodenal ulcer with peritonitis." *See* Rec. Doc. 29-11 at 2. The autopsy also revealed that Mr. Rombach had amphetamine, methamphetamine, and opiates in his system when he died. *See id.* at 3.

---

[4] Mr. Otis, Mr. Lewis, and Ms. Knight are all jail employees. *See* Rec. Docs. 27; 45-4.
[5] Two other inmates, Kelvin Jackson and Cornel Lucas, made similar statements on the phone to Mr. Rombach's mother the day that Mr. Rombach passed away. *See* Rec. Doc. 45-4. Both Mr. Jackson and Mr. Lucas said that they had heard Mr. Rombach vomiting for days and that Mr. Rombach had asked jail employees for medical assistance. *See id.*

5

In January 2016, Plaintiffs filed the instant lawsuit. *See* Rec. Docs. 1; 3. There are two distinct sets of defendants. All defendants have been sued in their individual and official capacities. *See* Rec. Doc. 3 ¶ 3. One set is a group of John and Jane Does, who are described as employees of "the Bogalusa Police Department and/or of the City of Bogalusa and its jail." *See id.* ¶ 3(d). The Amended Complaint alleges that these unnamed defendants are liable to Plaintiffs under 42 U.S.C. § 1983 for violating the Eighth and Fourteenth Amendments to the United States Constitution by denying Mr. Rombach necessary medical care, which resulted in his death. *See id.* ¶¶ 21, 23. The Amended Complaint also alleges that these unnamed defendants are liable to Plaintiffs under Louisiana Civil Code Articles 2315, 2315.1, and 2316 for causing Mr. Rombach's death. *See id.* ¶¶ 22-23.

The other set of Defendants is a group of three named individuals: Joe Culpepper, the Chief of Police in Bogalusa; Scott Adams, the Warden of the Bogalusa City Jail; and Wendy O'Quin Perrette, the Mayor of the Bogalusa. *See id.* ¶ 3(a)-(c). The Amended Complaint alleges that the named defendants are liable to Plaintiffs for facilitating Mr. Rombach's death through negligent hiring and training and failure to develop appropriate policies for inmates with medical needs. *Id.* ¶ 24(a)-(d). These allegations also appear to state a claim for municipal liability under the doctrine established by the United States Supreme Court in *Monell*

*v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The Amended Complaint also alleges that that the named defendants are liable for the actions of the unnamed defendants "under the principle of respondeat superior." Rec. Doc. 3 ¶ 24(e).

The named defendants then moved for summary judgment. *See* Rec. Doc. 29. Later that same day, Plaintiffs filed a motion for leave to file an amended complaint that properly names the John and Jane Doe defendants. *See* Rec. Doc. 30. The motion was referred to Magistrate Judge Wilkinson, who denied the motion without prejudice. *See* Rec. Doc. 42. Plaintiffs then filed a motion to continue trial, with the intention of reurging their motion for leave to file an amended complaint if a continuance was granted. *See* Rec. Doc. 43. The motion to continue trial was granted and Plaintiffs were given one week to file another motion for leave to file an amended complaint. *See* Rec. Doc. 51. Because the proposed Amended Complaint does to affect Plaintiffs' claims against the originally-named defendants, the instant motion for summary judgment is still before the Court.

**LAW AND ANALYSIS**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the movant bears the burden of proof, it must "demonstrate the absence of a genuine issue of material fact" using competent summary judgment evidence. *Celotex*, 477 U.S. at 323. But "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). When the movant meets its burden, the burden shifts to the non-movant, who must show by "competent summary judgment evidence" that there is a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Lindsey*, 16 F.3d at 618.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must first show a violation of the Constitution or of federal law, and then show that the violation was committed by someone acting under color of state law."[6] *Atteberry v. Nocuna Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). The United States Constitution entitles pretrial detainees and convicted inmates to medical care while in custody. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir.

---

[6] Defendants do not dispute that the Defendants in this case were acting under the color of state law when operating the Bogalusa City Jail. *See* Rec. Docs. 29; 50.

8

1996). For pretrial detainees, this right is derived from the Due Process Clause of the Fourteenth Amendment. *See id.* For convicted inmates, the right stems from the Eighth Amendment's prohibition on cruel and unusual punishment. *See id.* The government's duty is the same under both Amendments. *See id.* at 650.

An individual sued in his or her individual capacity for failure to provide adequate medical care can be found liable under two theories. First, an individual can be held liable for his or her own acts or omissions. "[A] state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id.* "Deliberate indifference in the context of an episodic failure to provide reasonable medical care . . . means that: 1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; 2) the official actually drew that inference; 3) the official's response indicates the official subjectively intended that harm to occur." *Thompson v. Upshur Cty.*, 245 F.3d 447, 458-59 (5th Cir. 2001).

Second, an individual can be held liable in a supervisory capacity for failure to supervise or train subordinate employees. "Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Id.* at 459. Instead, the failure to train or supervise must be its own

constitutional violation. To state a supervisory claim, the plaintiff must show that "1) the [defendant] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Id.* "Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Id.*

When an individual is sued in his or her official capacity, it is really a suit against the municipality that employs the defendant. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). To show municipal liability, also known as *Monell* liability, "a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Whitley v. Hanna*, 726 F.3d 631, 649 (5th Cir. 2013). *Monell* liability can only be imposed after finding an underlying constitutional violation by an individual. *See Becerra v. Asher*, 105 F.3d 1042, 1047-48 (5th Cir. 1997).

Plaintiffs have brought section 1983 claims against various Bogalusa city employees, all in their individual and official

capacities. *See* Rec. Doc. 3 ¶ 3. Plaintiffs maintain that various unnamed defendants who work at the Bogalusa jail personally denied Mr. Rombach medical care. *See id.* ¶¶ 21, 23. Plaintiffs also allege that three named defendants (Chief Culpepper, Warden Adams, and Mayor O'Quin Perrette) are responsible for the denying Mr. Rombach medical care by implementing inadequate medical policies and improperly training jail employees. *See id.* ¶ 24. The Court will first address the claims against Defendants in their individual capacities.

Plaintiffs have brought individual capacity claims against the unnamed John and Jane Doe Defendants. Plaintiffs did not name the individuals who personally denied Mr. Rombach medical care until after Defendants filed the instant motion for summary judgment. *See* Rec. Docs. 3 ¶ 3(d); 30. Plaintiffs' recent motion for leave to file an amended complaint was denied without prejudice, noting the possibility that it could be reurged if trial was subsequently continued. *See* Rec. Doc. 42. The Court has since granted such a continuance, allowing Plaintiffs time to seek leave to file a second amended complaint. *See* Rec. Doc. 51. Therefore, Defendants' motion for summary judgment of the claims against the unnamed John and Jane Doe defendants is denied without prejudice, to be reurged if Plaintiffs do not file a second amended complaint naming the individual jail employees who allegedly denied Mr. Rombach medical care.

There are also individual capacity claims against the three named defendants, Chief of Police Culpepper, Mayor O'Quin Perrette and Warden Adams. All three assert the defense of qualified immunity. *See* Rec. Doc. 29-1 at 8-11. "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law." *Thompson*, 245 F.3d at 456. "The first step in the qualified immunity analysis is to determine whether the plaintiff[s] ha[ve] alleged the violation of a clearly established federal constitutional . . . right." *Id.* at 457. "If the Plaintiff[s] do[] so, the Court must then assess whether the defendant's conduct was objectively reasonable in light of clearly established law." *Id.*

All three named defendants are entitled to qualified immunity because Plaintiffs have failed to raise a genuine issue of material fact about whether any of the named Defendants violated Mr. Rombach's constitutional rights. Neither the Amended Complaint nor the evidence in the record sheds any meaningful light on how Chief of Police Culpepper and Mayor O'Quin Perrette allegedly violated Mr. Rombach's constitutional rights. There is no evidence that either ever interacted with Mr. Rombach, exerted any influence on the medical care he received while in the Bogalusa City Jail, or played any role in setting the policy for providing medical care

to inmates at the Bogalusa City Jail. Given this dearth of evidence, Plaintiffs have not raised a genuine issue of material fact about whether Chief of Police Culpepper and Mayor O'Quin Perrette personally violated Mr. Rombach's constitutional rights. Chief of Police Culpepper and Mayor O'Quin Perrette cannot have acted with deliberate indifference if they were not aware of Mr. Rombach's medical needs. *See Thompson*, 245 F.3d at 458-59.

The analysis with respect to the claims against Warden Adams is slightly different because there is evidence that Warden Adams helped craft the medical care policy at the Bogalusa City Jail and had some interaction with Mr. Rombach. *See* Rec. Doc. 29-5 ¶¶ 1, 3, 10, 13. That being said, there is no evidence that Warden Adams directly controlled Mr. Rombach's treatment while in custody or that Warden Adams knew Mr. Rombach had requested additional medical care. *See* Rec. Doc. 29-5. When "Plaintiffs do not allege that [a defendant] was personally aware of [the inmate's] situation until after he died[,]" "the issue as to . . . qualified immunity is whether [the defendant's] policies were objectively reasonable in light of then clearly established law." *Thompson*, 245 F.3d at 462.

According to Warden Adams, the jail's treatment of inmates going through withdrawal was based on a nearby hospital's recommendation that "there is no real treatment of withdrawal symptoms and it is sufficient for the jail to observe the inmate in withdrawal and provide plenty of hydration, aspirin, and malox-

13

type products to assist the inmate with the symptoms experienced in going through the withdrawal." Rec. Doc. 29-5 ¶ 13. According to Warden Adams, "[j]ail personnel also observe inmates for any signs of medical distress and respond accordingly." *Id.* ¶ 10. Apparently, a "medical facility is a block away and is available if and when something emergent and/or unusual occurs with an inmate in withdrawal or for any other reason." *Id.* ¶ 13.

Plaintiffs have provided no evidence that Warden Adams' policy was deficient; observing inmates going through withdrawal, treating them with over-the-counter medication and hydration, and seeking professional medical assistance in emergent situations is essentially what Plaintiffs allege should have been afforded Mr. Rombach. Instead, Plaintiffs have developed evidence in the record that jail employees may have failed to implement the policy described by Warden Adams. Because Plaintiffs do not allege that Warden Adams designed a policy that denied Mr. Rombach medical care, Warden Adams is entitled to qualified immunity. *See Thompson*, 245 F.3d at 462-63. This is especially true because supervisory liability normally requires "[p]roof of more than a single instance of . . . lack of training causing a violation of constitutional rights," *id.*, and Warden Adams states in his affidavit that "[n]o inmate has ever died in the Bogalusa Jail Facility as a result of withdrawal from illicit drugs," Rec. Doc. 29-5 ¶ 13.

Having addressed Plaintiffs' individual capacity claims against the named Defendants, Plaintiffs may still proceed on their official capacity claims against the named Defendants. As discussed above, the official capacity claims are actually claims against the City of Bogalusa. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). But even though these claims are brought against the municipality, Plaintiffs must still show an underlying violation of constitutional rights. *See Becerra*, 105 F.3d at 1047-48. Because the individual capacity claims against the named defendants have been dismissed, any *Monell* claim will depend on the liability of individual jail employees who have not yet, but may be, named in this lawsuit. *See id*. It would be unfair and imprudent to analyze the legality of individual employees' actions before the defendants have actually been named and given the opportunity to participate in the lawsuit with the assistance of counsel. Therefore, the Defendants' motion for summary judgment on Plaintiffs' *Monell* claim is denied without prejudice.

Plaintiffs also bring claims against all Defendants under Louisiana state law for negligently causing Mr. Rombach's death. *See* Rec. Doc. 3 ¶ 22 (referring to La. Civ. Code arts. 2315, 2315.1, and 2316). To successfully bring such a claim, a plaintiff must prove a duty, breach of that duty, cause-in-fact, proximate cause, and actual damages. *See Brown v. Lee*, 94-104, p.3 (La. App.

15

5 Cir. 7/13/94); 639 So. 2d 897, 898-99. Under Louisiana state law,

> A police officer owes a duty to a prisoner to protect him from harm and to preserve his safety. The police officer must do what is reasonable under the circumstances[,] [and] . . . owes a higher degree of care to an intoxicated person than to one who is more capable of caring for himself. It is the duty of the officer to see that reasonable medical service is provided to a prisoner if and when his physical condition discloses the need of such services.

*Id.* at 899 (internal citations omitted).

As with the individual capacity section 1983 claims, the Court will not address the allegations against unnamed jail employees until Plaintiffs have had the opportunity to amend their complaint. Defendants can reurge the motion after any individual jail employees are named in an amended complaint. However, the state law claims against the named Defendants can be addressed now.

As discussed previously, the named Defendants were not personally involved in the decision not to provide Mr. Rombach additional medical care. Therefore, they could only be liable for negligently developing the medical care policy in place at the jail. Louisiana state law has its own qualified immunity provision that exempts "public entities or their officers or employees" from liability "based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties." La. Stat. § 9:2798.1(B). Decisions about how

to allocate resources to ensure "sufficient adequate prison facilities" are discretionary and officials tasked with crafting policy for prison facilities are entitled to qualified immunity under Louisiana state law. *See Jackson v. State el rel. Dep't of Corr.*, 2002-2882, p.8 (La. 5/15/01); 785 So. 2d 803, 808-09; *see also Sarasino v. State*, 16-408, p.6-11 (La. App. 5 Cir. 3/15/17); 215 So. 3d 923, 927-31. Therefore the state law negligence claims against Chief of Police Culpepper, Mayor O'Quin Perrette, and Warden Adams are dismissed with prejudice because the named Defendants are immune from suit.

While vicarious liability under a *respondeat superior* theory is potentially viable under state law, the liable party is the State, not the tortfeasor's supervisors. *See Anderson v. Louisiana ex rel. La. Dep't of Corr.*, No. 12-1821, 2013 WL 5707860, at *3 (W.D. La. Oct. 17, 2013); *Tyson v. Tanner*, No. 08-4445, 2010 WL 2216507, at *7 (E.D. La. May 7, 2010). Therefore, the state law *respondeat superior* claims against Chief of Police Culpepper, Mayor O'Quin Perrette, and Warden Adams are also dismissed with prejudice.

In summary, the claims against Chief of Police Culpepper, Warden Adams, and Mayor O'Quin Perrette (1) under 42 U.S.C. § 1983 in their individual capacities and (2) under Louisiana state law have been dismissed with prejudice. Defendants' motion for summary judgment has been denied without prejudice with respect to (1) all

claims against the unnamed jail employees and (2) Plaintiffs' municipal liability claim under *Monell*. Defendants may reurge their motion for summary judgment with respect to these claims after individual jail employees have been named as defendants and given adequate opportunity to participate in this litigation with the assistance of counsel.

New Orleans, Louisiana, this 8th day of March, 2018.

_____
SENIOR UNITED STATES DISTRICT JUDGE